*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CMS ENERGY CORP.,

        Petitioner-Appellant,

v

DEPARTMENT OF TREASURY,

        Respondent-Appellee.

UNPUBLISHED
February 17, 2026
9:52 AM

No. 374696
Tax Tribunal
LC No. 19-003783

Before: GADOLA, C.J., and BOONSTRA and PATEL, JJ.

PER CURIAM.

Petitioner appeals as of right an order granting summary disposition to respondent under MCR 2.116(C)(10) (no genuine issue of material fact) and denying petitioner's refund request for tax years 2013 through 2016. We affirm.

## I. BACKGROUND

Petitioner generates electricity and sells it wholesale to the Midcontinent Independent System Operator (MISO), a regional transmission organization that coordinates and controls the transmission of electricity in multiple states, including Michigan. The transactions between petitioner and MISO are governed by a Tariff. Under the Tariff, petitioner is a Market Participant, and MISO is the Energy Market Counterparty, i.e., the contracting counterparty, for all Market Activities, including the purchase and sale of energy. MISO is authorized to act as a counterparty by Federal Energy Regulatory Commission (FERC) Order No. 741, *Credit Reforms in Organized Wholesale Electric Markets*, 75 FR 65942-01; 18 CFR Part 35 (2010), which provides such an option to protect against risks associated with a Market Participant filing for bankruptcy.

The Tariff provides that the Point of Receipt is where a generator like petitioner makes its electricity available to MISO, as specified in a Service Agreement. Petitioner and MISO entered into two Service Agreements called Generator Interconnection Agreements, which provide for petitioner to deliver electricity to MISO at substations located in Michigan.

After paying its Michigan corporate income tax for tax years 2013 through 2016, petitioner sought to amend its returns and obtain a partial refund. Petitioner argued that some of its wholesale

electricity sales should not be sourced to Michigan. Respondent denied petitioner's refund request. Respondent reasoned that petitioner's wholesale electricity sales to MISO were properly sourced to Michigan because the contractually required points of delivery were in Michigan. Petitioner filed a petition in the Tax Tribunal. Petitioner claimed that its sales should be sourced on the basis of the ultimate destination of the electricity, which petitioner argued was where the customer utilized the electricity or where MISO resold the electricity to a wholesale purchaser. Respondent maintained that all of petitioner's wholesale electricity sales were properly sourced to Michigan because that is where petitioner delivered the electricity to MISO. The Tax Tribunal granted summary disposition to respondent under MCR 2.116(C)(10) and denied petitioner's refund request. This appeal followed.

## II. STATUTORY CLAIM

Petitioner first argues that the Tax Tribunal erred by concluding that petitioner's wholesale electricity sales were properly sourced to Michigan. We disagree.

"If fraud is not claimed, this Court reviews the Tax Tribunal's decision for misapplication of the law or adoption of a wrong principle." *Briggs Tax Serv, LLC v Detroit Pub Sch*, 485 Mich 69, 75; 780 NW2d 753 (2010). This Court reviews de novo statutory interpretation and summary disposition rulings. *Id*. Unambiguous statutory language must be enforced as written. *Four Zero One Assoc, LLC v Dep't of Treasury*, 320 Mich App 587, 592; 907 NW2d 892 (2017).

> A motion under MCR 2.116(C)(10) . . . tests the factual sufficiency of a claim. When considering such a motion, a [tribunal] must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion. A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact. A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ. [*El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019) (cleaned up).]

MCL 206.661(2) provides, in relevant part, "The tax base of a taxpayer whose business activities are subject to tax both within and outside of this state shall be apportioned to this state by multiplying the tax base by the sales factor calculated under [MCL 206.663]." Under MCL 206.663(1), "the sales factor is a fraction, the numerator of which is the total sales of the taxpayer in this state during the tax year and the denominator of which is the total sales of the taxpayer everywhere during the tax year." For sales of electricity, the contractual point of delivery is used to source the sale:

> Sales of tangible personal property are in this state if the property is shipped or delivered, or, *in the case of electricity* and gas, the contract requires the property to be shipped or delivered, to any purchaser within this state based on the ultimate destination at the point that the property comes to rest regardless of the free on board point or other conditions of the sales. [MCL 206.665(1)(a) (emphasis added).]

The inquiry focuses on the ultimate destination that the property comes to rest, regardless of any free-on-board point or other conditions of sale. However, the ultimate destination is determined in the context of a sale to "any purchaser." The statutory language thus requires the sourcing of a sale to "any purchaser" rather than following the property through subsequent resales.

In this case, the issue is whether petitioner sells electricity to MISO in Michigan, i.e., whether a contract requires petitioner to deliver electricity to MISO as a purchaser in this state based on the ultimate destination that the property comes to rest, regardless of any free-on-board point or other conditions of sale. If so, the sales are properly sourced to Michigan under MCL 206.665(1)(a).

MCL 206.609(4) states, in relevant part:

> "Sale" or "sales" means, except as provided in subdivision (e), the amounts received by the taxpayer as consideration from the following:
>
> (a) The transfer of title to, or possession of, property that is stock in trade or other property of a kind that would properly be included in the inventory of the taxpayer if on hand at the close of the tax period or property held by the taxpayer primarily for sale to customers in the ordinary course of the taxpayer's trade or business.

Petitioner's transactions with MISO constituted sales. The Tax Tribunal correctly reasoned: "There is no dispute that [p]etitioner receives consideration for the electricity it generates and sells. There is also no dispute that title to the electricity is transferred and that [p]etitioner transfers title to MISO and not to a Market Participant." Although petitioner says that MISO takes "flash title," i.e., title for a brief period, and that this is for federal regulatory purposes, the Tribunal aptly noted that "the reason *why* flash title occurs is of no consequence" and "the fact remains that title to the electricity is transferred to MISO." As the Tribunal explained, petitioner's effort to minimize the significance of the transfer of title to MISO is unconvincing because

> the transfer of title wouldn't be required if FERC did not believe it was necessary, or significant. It is incongruous to argue that flash title is important and necessary if a Market Participant declares bankruptcy, while at the same time implying that taking flash title is a mere formality and virtually meaningless.

Further, it was undisputed that the sale of electricity was part of the ordinary course of petitioner's business. For these reasons, the Tribunal correctly determined that petitioner's transactions with MISO constitute sales under MCL 206.609(4) and that, "[b]ecause title is transferred to MISO, the sale is to MISO."

Petitioner argues that the Tribunal erred by failing to determine who paid the consideration for the purchased electricity. Petitioner does not dispute that it received money from MISO but says that MISO merely collected money from a Market Participant buyer and remitted the money to petitioner. But petitioner's argument on this point lacks a basis in the statutory definition of "sale," which refers to "amounts received by the taxpayer as consideration . . . ." MCL 206.609(4).

It is petitioner's *receipt* of consideration that is pertinent under the statutory definition of "sale." The statute does not require an inquiry into the ultimate source of the funds used to pay petitioner.

Petitioner cites *PM One, Ltd v Dep't of Treasury*, 240 Mich App 255, 267; 611 NW2d 318 (2000), for the proposition that there is no consideration when a party lacks a "personal right to the money . . . ." Petitioner suggests that MISO had no personal right to money used to pay petitioner. Petitioner's reliance on *PM One* is misplaced. *PM One* involved the Small Business Tax Act (SBTA), MCL 208.1 *et seq. PM One*, 240 Mich App at 257. The SBTA has been repealed and does not apply to tax years that began after December 31, 2007. 2006 PA 325, § 1; *Uniloy Milacron USA, Inc v Dep't of Treasury*, 296 Mich App 93, 94 n 1; 815 NW2d 811 (2012). The present case involves the 2013 through 2016 tax years, and the SBTA is thus inapplicable here.[1]

Regardless, *PM* One is distinguishable. In *PM One*, 240 Mich App at 258, the petitioner managed real estate developments on behalf of property owners. The petitioner retained vendors to provide maintenance services for the properties. *Id*. at 258-259. The petitioner paid each vendor by transferring money from a client's individual account into a central account and then issuing a check to the vendor from the central account. *Id*. at 259. This Court stated that there was "no evidence that funds flowing into the [central account] constituted consideration *to or from* [the petitioner] because [the petitioner] had no personal right to the money . . . ." *Id*. at 267. Conversely, in this case, MISO was a counterparty to the transactions. FERC provided for this counterparty status as legal support for setoff rights in bankruptcy, as explained in FERC Order No. 741, ¶ 82. "The right of setoff (also called offset) allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A." *Citizens Bank of Maryland v Strumpf*, 516 US 16, 18; 116 S Ct 286; 133 L Ed 2d 258 (1995) (cleaned up). MISO therefore has a personal right to the money because it has setoff rights if a Market Participant files for bankruptcy. The analysis in *PM One* is thus inapplicable to this case.

Next, as discussed, under MCL 206.665(1), the contractual point of delivery is used to source the sale of electricity. The Tax Tribunal determined that the Tariff was a contract that governed the sales of electricity from petitioner to MISO. In its principal brief on appeal, petitioner fails to challenge this determination, i.e., petitioner fails to argue that the Tariff is not a contract. A party's failure to brief the merits of an issue constitutes abandonment. *Prince v MacDonald*, 237 Mich App 186, 197; 602 NW2d 834 (1999). It is true that, in its reply brief on appeal, petitioner argues that the Tariff is not a contract. But "[r]eply briefs must be confined to rebuttal, and a party may not raise new or additional arguments in its reply brief." *Kinder Morgan Mich,*

---

[1] Petitioner states that the SBTA "used statutory language materially similar to the controlling statutory language here." Petitioner fails to quote SBTA language and explain how it is similar to the controlling statutory language. "A party may not simply announce a position and leave it to this Court to make the party's arguments and search for authority to support the party's position. Failure to adequately brief an issue constitutes abandonment." *Seifeddine v Jaber*, 327 Mich App 514, 519-520; 934 NW2d 64 (2019) (citation omitted).

*LLC v City of Jackson*, 277 Mich App 159, 174; 744 NW2d 184 (2007). Petitioner has therefore abandoned the issue whether the Tariff constitutes a contract.

Even if the issue was not abandoned, petitioner waived the issue by conceding that the Tariff could be viewed as a contract. At the motion hearing in the Tax Tribunal, petitioner's counsel stated, "I think that one could construe the [T]ariff to be a contract here because it does govern the transactions." Petitioner's counsel further stated that, "in that sense, the [T]ariff is a contract," and that "we do have this contract . . . ."

> A waiver is a voluntary and intentional abandonment of a known right. A party cannot stipulate to a matter and then argue on appeal that the resultant action was error. A party who waives a right is precluded from seeking appellate review based on a denial of that right because waiver eliminates any error. To allow a party to assign error on appeal to something that he or she deemed proper in the lower [tribunal] would be to permit that party to harbor error as an appellate parachute. [*LeFever v Matthews*, 336 Mich App 651, 670 n 3; 971 NW2d 672 (2021) (cleaned up).]

Under the Tariff, the Point of Receipt is where a generator like petitioner makes its electricity available to MISO, as specified in a Service Agreement. Petitioner and MISO entered into Service Agreements called Generator Interconnection Agreements, which provide for petitioner to deliver electricity to MISO at certain substations or interconnection points, all of which are in Michigan. Petitioner emphasizes that MISO's offices are located outside of Michigan, but that does not change the fact that the contractual points of delivery are in Michigan.

Petitioner argues that it sold electricity to Market Participants rather than to MISO. This argument fails. MISO qualifies as "any purchaser" under MCL 206.665(1)(a). The statute does not define the word "purchase." This Court may therefore consult a dictionary definition. *Hecht v Nat'l Heritage Academies, Inc*, 499 Mich 586, 621 n 62; 886 NW2d 135 (2016). "Purchase" means, in relevant part, "to obtain by paying money or its equivalent: BUY." *Merriam-Webster's Collegiate Dictionary* (11th ed). The Tariff defines "Market Activities" as including the purchase and sale of energy. Petitioner's petition in the Tax Tribunal alleged that petitioner was required to make all wholesale electricity sales "to and through" MISO. Title is passed from petitioner to MISO. There is no statutory requirement that the purchaser consume the product in order for a sale to occur. MCL 206.605(1)(a) refers to "any purchaser." In light of petitioner's own allegations and the Tariff language, MISO constitutes "any purchaser" and the transactions between petitioner and MISO whereby MISO received electricity in Michigan qualified as sales.

Petitioner argues that the Tax Tribunal ignored the language in MCL 206.665(1)(a) referring to "the ultimate destination at the point that the property comes to rest regardless of the free on board point or other conditions of the sales." Petitioner contends that the interconnection point to the transmission grid is not the ultimate destination of petitioner's electricity. Rather, petitioner reasons, the interconnection point is the free-on-board point and thus must be disregarded under MCL 206.665(1)(a) in determining the ultimate destination of the electricity. Petitioner suggests that the federally-mandated transfer of title to MISO is a mere condition of the sale that likewise must be disregarded for tax purposes. We find no merit in this argument.

The Tax Tribunal did not ignore the statutory language at issue. The Tribunal reviewed the language and rejected petitioner's argument. Petitioner has identified no language in the Tariff or Generator Interconnection Agreements indicating that the interconnection points are free-on-board points. Nor is there any basis to conclude that the transfer of title to MISO is a mere condition of the sale. Petitioner fails to recognize that the delivery of electricity to MISO in exchange for consideration is the sale itself. Hence, although any free-on-board points or other conditions of sale must be disregarded under MCL 206.665(1), there are no such points or conditions to disregard in this case.

Petitioner cites *Uniloy*, 296 Mich App at 99, for the proposition that the location where title is transferred is not determinative of where a sale occurred. But *Uniloy* involved the SBTA, *Uniloy*, 296 Mich App at 94, which, as noted earlier, has been repealed and does not apply here.

*Uniloy* is also distinguishable. In that case, the plaintiff manufactured molds in Michigan and sold the molds to a distributor for resale. *Id*. at 95. After the distributor solicited orders from customers, the plaintiff shipped the products directly to the customers, most of whom were outside of Michigan. *Id*. The distributor "never obtained possession of the products." *Id*. This Court explained that, under the SBTA, "a sale by plaintiff would have been sourced to Michigan for purposes of the sales factor only if plaintiff's product was carried and turned over, handed over, surrendered, sent away, or transported to a customer within Michigan." *Id*. at 99 (cleaned up). This Court stated that there was no evidence "that the products were shipped or delivered by plaintiff to [the distributor]." *Id*. at 99. This Court reasoned that "[j]ust because plaintiff sold the products to [the distributor] does not necessarily mean that plaintiff shipped or delivered the products to [the distributor] . . . ." *Id*. *Uniloy* is of little help here because it did not involve the contractual-point-of-delivery clause of MCL 206.665(1). Also, the plaintiff in *Uniloy* delivered products directly to out-of-state customers, but petitioner is contractually bound to deliver electricity to MISO in Michigan. *Uniloy* thus does not alter the conclusion that petitioner's wholesale electricity sales should be sourced to Michigan.

Petitioner also relies on caselaw from other states. "Decisions from other states are not binding on this Court, but they can be considered persuasive." *Johnson v Johnson*, 329 Mich App 110, 124 n 8; 940 NW2d 807 (2019). The cases from other states that petitioner cites are not persuasive. Those cases concern the tax laws of other states rather than the Michigan statutory provisions at issue here.

For example, in *Powerex Corp v Dep't of Revenue*, 357 Or 40; 346 P3d 476 (2015), which petitioner cites, the Oregon Department of Revenue argued that the contractual point of delivery of natural gas was at a pipeline hub in Oregon. *Id*. at 44-45. The taxpayer responded that the sale should be sourced to California, where the purchaser was located. *Id*. at 45. The Oregon court concluded that the contractual point of delivery was a condition of sale that was effectively the same as a free-on-board point and was thus statutorily required to be disregarded in determining where the natural gas was delivered to the purchaser. *Id*. at 54. However, the Oregon statute at issue in *Powerex* differs from MCL 206.665(1)(a). The Oregon statute provides that a sale is in Oregon if "[t]he property is delivered or shipped to a purchaser . . . within this state regardless of the f.o.b. point or other conditions of the sale . . . ." Or Rev Stat 314.665(2)(a); see also *Powerex*, 357 Or at 43 (quoting the statutory language). Unlike the Oregon statute, MCL 206.665(1)(a) expressly provides, in the case of electricity and gas, for consideration of where "the contract

requires the property to be shipped or delivered . . . ." *Powerex* thus lacks persuasive value in the instant case.

Petitioner also cites *Lockheed Martin Corp v Hegar*, 601 SW3d 769 (Tex, 2020). In that case, the taxpayer manufactured F-16 fighter jets in Texas for foreign governments. *Id*. at 770-771. "As required by federal law, the foreign buyers contracted with the U.S. government to purchase the jets, and the U.S. government in turn contracted with [the taxpayer]." *Id*. at 771. The Texas court held that the sales should not be sourced to Texas for tax purposes. *Id*. at 771, 778-779. The court held that, in the "unique circumstances" of that case, the pertinent buyers were "the foreign governments for whom the aircraft were manufactured and to whom they were ultimately delivered." *Id*. at 776. The U.S. government taking intermediate title was a condition of the sale that was required to be disregarded under Texas tax law. *Id*. at 776-778. The U.S. government was required by a federal statute to act as an intermediary, and "the F-16s at issue were 'custom built' and 'uniquely designed' to the foreign buyers' specifications." *Id*. at 777.

Given what the Texas court itself described as the "unique circumstances" of that case, *Lockheed Martin* is not instructive in the present case. *Lockheed Martin* did not involve a tax statutory provision specifically pertaining to electricity and gas. Moreover, that case involved particular foreign-government purchasers for whom the F-16 fighter jets were "custom built" and "uniquely designed." There is no analogous situation here. Petitioner has pointed to no evidence of an identifiable wholesale purchaser of petitioner's electricity following delivery to MISO. After petitioner's electricity is injected into the grid, it cannot be differentiated from electricity injected by other generators. Again, MISO is a contractual counterparty in the transactions with petitioner.

The Tax Tribunal properly granted summary disposition to respondent.

## III. CONSTITUTIONAL CLAIM

Petitioner next argues that the sourcing to Michigan of all of petitioner's wholesale electricity sales violates the Commerce Clause, US Const, Art I, § 8, cl 3. We disagree.

Constitutional issues are reviewed de novo. *Sidun v Wayne Co Treasurer*, 481 Mich 503, 508; 751 NW2d 453 (2008).

Under the Commerce Clause, a state may tax the intrastate aspects of interstate commerce, i.e., the portion of an entity's income that can be fairly attributed to the state. *Exxon Corp v Wisconsin Dep't of Revenue*, 447 US 207, 219; 100 S Ct 2109; 65 L Ed 2d 66 (1980). "A tax satisfies the Commerce Clause when '[1] the tax is applied to an activity with a substantial nexus with the taxing State, [2] is fairly apportioned, [3] does not discriminate against interstate commerce, and [4] is fairly related to the services provided by the State.' " *Vectren Infrastructure Servs Corp v Dep't of Treasury*, 512 Mich 594, 642; 999 NW2d 748 (2023), quoting *Amerada Hess Corp v Dir, Div of Taxation, New Jersey Dep't of Treasury*, 490 US 66, 72; 109 S Ct 1617; 104 L Ed 2d 58 (1989) (alterations in original).

The test for determining whether a tax satisfies the Commerce Clause is essentially the same as the test for determining whether the tax meets due process requirements because both tests require that a state's apportionment formula be fair. *Vectren*, 512 Mich at 642-643, citing

*Container Corp of America v Franchise Tax Bd*, 463 US 159, 169; 103 S Ct 2933; 77 L Ed 2d 545 (1983).[2] This fairness requirement has "two components, known as internal and external consistency." *Vectren*, 512 Mich at 643. "Internal consistency requires that if the formula was 'applied by every jurisdiction, it would result in no more than all of the unitary business income being taxed.' " *Id*., quoting *Container Corp*, 463 US at 169.

> External consistency means that "the factor or factors used in the apportionment formula must actually reflect a reasonable sense of how income is generated. The Constitution does not invalidate an apportionment formula whenever it *may* result in taxation of some income that did not have its source in the taxing State." [*Vectren*, 512 Mich at 643, quoting *Container Corp*, 463 US at 169-170.]

A party challenging the proportionality of a tax "has a heavy burden of showing by clear and cogent evidence that the apportionment formula attributed income out of all appropriate proportion to the business activity in Michigan or that it led to a grossly distorted result." *Vectren*, 512 Mich at 629 (cleaned up).

The Michigan apportionment methodology satisfies the internal consistency test. If every state sourced wholesale electricity sales on the basis of the contractual point of delivery like MCL 206.665(1)(a) requires, petitioner would not be double taxed. The contractual points of delivery for petitioner's wholesale electricity sales are in Michigan. Petitioner offers no evidence of double taxation, i.e., that it has been or will be taxed by other states for these wholesale electricity sales.

The external consistency test is also met. The Michigan apportionment formula reflects a reasonable sense of how income is generated. Petitioner generates electricity in Michigan. The electricity is delivered to MISO in Michigan. Petitioner suggests that the external consistency test is not satisfied because the electricity is sold to Market Participant buyers in other states. But the pertinent sales are to MISO in Michigan. Also, respondent presented evidence that the substantial majority of electricity generated in Michigan is consumed in Michigan. Petitioner fails to satisfy its "heavy burden of showing by clear and cogent evidence that the apportionment formula attributed income out of all appropriate proportion to the business activity in Michigan or that it led to a grossly distorted result." *Vectren*, 512 Mich at 629 (cleaned up).

Affirmed.


/s/ Michael F. Gadola
/s/ Mark T. Boonstra
/s/ Sima G. Patel

---

[2] On appeal, petitioner asserts only a Commerce Clause violation, not a due process violation.